**SIGNED this 01st day of February, 2007.**

_____
**FRANK R. MONROE**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE:   DAVID W. MORRISON | § | CASE NO. 04-12643 FRM |
| | § | |
| WESTERN BUILDERS OF AMARILLO, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADV. NO. 04-1214 |
| | § | |
| DAVID W. MORRISON, | § | |
| Defendant, | § | |

<u>MEMORANDUM OPINION</u>

This matter came for trial on the merits to determine the dischargeability of a debt pursuant to §§ 523(a)(2)(B), (a)(4) and (a)(6).  As such this matter falls within the Court's core jurisdiction under 28 U.S.C. §157(b)(2)(I), 28 U.S.C. §1334(a) and (b), §157(a), §151 and the Standing Order of Reference in the Western District of Texas.   At the conclusion of the trial, the Court requested briefing on various issues which briefs were submitted by parties' counsel. After reviewing the briefs, the transcript, the pleadings and evidence and performing  its own

1

independent research, the Court makes the following findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

Findings of Fact

Introduction

Western Builders of Amarillo, Inc. ("Western Builders"), a general contractor, engaged Morrison Excavation, Inc. ("Morrison Excavation") as a subcontractor, by written contract dated March 6, 2002 to perform site construction work for a Wal-Mart in Eagle Pass, Texas. *Plaintiff's Exhibit 5.* David Morrison ("Morrison") was the primary stockholder of Morrison Excavation at the time and was also President of Morrison Excavation. After making on site visits to some of Morrison Excavation's other jobs, but before execution of the contract, Western Builders requested that Morrison provide financial information regarding Morrison Excavation. On February 22, 2002 Morrison faxed a Morrison Excavation, Inc. financial statement to Western Builders. Western Builders alleges this financial statement was materially false and that Morrison knew it was materially false prior to faxing. Western Builders claims it reasonably relied on this statement in contracting with Morrison Excavation and suffered damages as a result when Morrison Excavation could not complete the contract. Morrison Excavation's accountant corrected the financial statement on May 4, 2002. Morrison did not provide this corrected financial statement to Western Builders nor did he ever tell Western Builders the original was incorrect. Morrison Excavation abandoned the construction job on or about August 19, 2002. Western Builders had to pay additional funds to other subcontractors and suppliers to complete the job as well as to pay Morrison Excavation's subcontractors/suppliers that had not been paid at a loss to Western Builders of $549,773.63.

2

Morrison personally filed bankruptcy on May 13, 2004.  Western Builders claims that had Morrison submitted an accurate financial statement for Morrison Excavation, Western Builders would not have entered into the contract in the first place.  Additionally, Western Builders claims that even if Morrison did not know of the error at the time the financial statement was faxed, he at least knew of the error prior to execution of the contract or prior to receipt of contract funds and had a duty to inform Western Builders of such error.  Western Builders claims that it would never have hired Morrison Excavation if it had known its true financial condition and would have at least terminated the contract immediately had it seen the amended financials in May of 2002.

Western Builders also claims that Morrison requested and received from Western Builders advance payments under the contract to pay Morrison Excavation subcontractors, but that Morrison Excavation failed to pay some of these subcontractors with these payments. Western Builders claims that Morrison used these funds for his personal use and that Morrison submitted false certifications or completion affidavits  in order to be paid funds to which he was not entitled.

Witnesses

Eight persons testified at this trial:

David Morrison–Morrison was President and stockholder of Morrison Excavation. Morrison graduated from Texas Tech University with a degree in social welfare and family relations and later obtained a theology degree.  Unable to provide economically for his family within his field of work, he ended up in the construction business.  He indicated in his testimony that he did not understand much about financial statements.  Morrison's CPA, Larry Fuller, testified that in the many years of preparing Morrison's business and personal tax returns and

3

financial statements that Morrison did not spend a lot of time reading them. However, Morrison has been in the construction business for 20 plus years, and he prepared and submitted the construction bids and obviously had a basic working knowledge and understanding of accounting at least as it pertained to his business.

Larry Fuller–Mr. Fuller was the CPA for Morrison Excavation and Morrison personally. Mr. Fuller prepared the corporate and personal returns and financial statements for Morrison and Morrison Excavation and provided financial advice to Morrison for some 10 years.

Shelley Dexter (now Olin)–Ms. Dexter was Morrison Excavation's bookkeeper for 4 1/2 years. She performed most of the accounting functions for the company and handled most of the financial communications between Mr. Fuller and the company. Ms. Dexter's desk was in close proximity to Morrison's office.

Jackie Davenport–Ms. Davenport was a Morrison Excavation employee for approximately 3 years until it closed. Ms. Davenport handled the accounts payable. Her desk was next to Ms. Dexter's and in close proximity to Morrison's office.

Jerry Rohane–Mr. Rohane is President of Western Builders. Mr. Rohane has a Bachelor's degree in civil engineering from New Mexico State and a current Texas professional engineer's license. He has been employed by Western Builders for 21 years, is a part owner of the company since 1994, and has been its President since 1994.

Wes-Knapp–Mr. Knapp is the Chief Financial Officer of Western Builders. Mr. Knapp graduated from Texas Tech University with an accounting degree and worked approximately 9 years for a large accounting firm before joining Western Builders. He is also part owner of the company.

4

Ben Brookes–Mr. Brookes is a superintendent of construction jobs for Western Builders. Mr. Brookes had been with Western Builders for 7 years at time of trial. He graduated from Texas A&M with a civil engineering degree. Mr Brookes dealt directly with Morrison in connection with the Eagle Pass project as the project manager. More specifically, he handled the draw requests from Morrison Excavation and worked with Morrison on changes to the contract and advance payments when requested by Morrison.

Harvey Corn-Mr. Corn is a Certified Public Accountant and the expert hired by Morrison to testify regarding the reasonableness of Western Builder's reliance on the incorrect financial statement submitted to Western Builders.

<u>Background</u>

On January 31, 2002 Larry Fuller, Morrison's long-time business adviser and CPA ("Mr. Fuller"), issued a financial statement as of December 31, 2001 *(Plaintiff's Exhibit 91)* that overstated the value of Morrison Excavation's accounts receivable by $857,913.55 although this error was not discovered until mid February, 2002. Before the error was discovered, Fuller met with Morrison on February 6, 2002 to discuss Morrison Excavation's financial situation. In connection with this meeting, Mr. Fuller had prepared some handwritten notes "really, to myself for a meeting with David" regarding items that may be discussed. *Transcript Pg. 112 and Plaintiff's Exhibit 73*. Mr. Fuller's notes indicate that Morrison's current business condition was "cash broke, way behind to vendors, collecting money before job completed and no money to pay bills from completed jobs, and vendors filing liens." *Plaintiff's Exhibit 73.* These notes also list certain options evidently available to Morrison based on the serious financial condition–

"A) "sell everything-pay vendors & close business & get a job–*plus*: out of debt;
*minus*:job won't pay for your life style"

5

B) sell equipment-downsize and keep business going–*plus*: gets rid of lot of debt, keeps business going; *minus*: increases monthly leases, doesn't get many vendors paid.

*Plaintiff's Exhibit 73.*

Western Builders claims that Mr. Fuller discussed all these options with Morrison at this meeting.  Mr. Fuller agreed that the options were discussed in general regarding Morrison Excavation's serious financial situation and how to alleviate this condition. However, Mr. Fuller did not "want the Court to believe that David and I discussed every one of those" items.  "Those were notes to me to go to a meeting with David.  And what was said in that meeting, I don't remember that we went over every one of them okay?" *Transcript Pg. 116-117.*  This particular meeting, however, sets the stage for the events that ensued and proves that Morrison as of February 6, 2002 knew his business was in poor financial condition and needed significant help to stay in business.

At about this same time, Morrison was also discussing selling part of Morrison Excavation to Kyle Hughes who was interested in purchasing a percentage of the shares and helping run the financial end of the business.  Morrison did sell 49% of his stock in Morrison Excavation to Mr. Hughes for $500,000 in March, 2002. *Transcript Pg. 21-22.*  Mr. Hughes paid this money directly to Morrison.  Although there was some testimony from Morrison and Mr. Fuller that Morrison turned around and invested this money back into the business, there was no definitive evidence as to the exact amounts reinvested and whether such were treated as loans to Morrison Excavation or additional equity infusions.

On February 15, 2002 Morrison Excavation's bookkeeper, Shelley Dexter ("Ms. Dexter") faxed to Mr. Fuller corrections to the accounts receivable and accounts payable report. *Plaintiff's Exhibit 95.*  Ms. Dexter and Mr. Fuller agree that they knew about the error by this

6

date.    Boydette Miller, who was an employee of the company that implemented Morrison Excavation's new accounting system, supposedly found the error which Ms. Dexter forwarded on to Mr. Fuller to enable him to correct the financial statement.   The error was a $857,000 plus overstatement to accounts receivable.  So, when the adjustment was made due to this error, it had a direct effect of reducing assets by almost half and decreasing income a similar corresponding amount–the $857,000.  So, when the corrected statement was finally issued, it reflects Morrison Excavation showing deficits in equity and reflecting an operating loss for 2001. *Plaintiff's Exhibit 98.*

On February 14, 2002 Morrison Excavation submitted its bid to Western Builders on the Eagle Pass project.   Jerry Rohane, ("Mr. Rohane") Western Builders' President contacted Morrison regarding the bid.  Mr. Rohane testified that Morrison's company appeared to be a potentially good fit based on the location of the business, the capacity to do the work and the personal character that Western Builders sought in its subcontractors.  Mr. Rohane testified that although Morrison Excavation was the low bidder on the project, this was not the sole basis upon which it awarded the contract.  Because this was the first job that Morrison Excavation was to perform for Western Builders, Mr. Rohane decided to check out Morrison Excavation's job sites and Morrison himself.  As a result, Mr. Rohane and the project manager, Ben Brookes ("Mr. Brookes")  traveled to Austin on February 22, 2002.   They were impressed with some of Morrison Excavation's other jobs.  Mr. Rohane testified that they traveled to four job sites, one of which was a Home Depot still in progress.  Mr. Rohane met the superintendent on the site as well as the general contractor.  To Mr. Rohane the site was "well organized.  Everything about the job looked good.  Equipment looked like it was being used in the proper methodology.  It was a big, . . . . site so it's pretty easy to look and see if the dirt contractor knows what he's

7

doing by the way the site looks like." *Transcript Page 235*.  Morrison indicated that his company was doing well.  He did not mention the February 6, 2002 meeting with his CPA, Fuller, regarding his company's serious financial situation although he did tell Mr. Rohane about the potential new investor.  After this meeting, Mr. Rohane requested a financial statement, and Morrison faxed to him the incorrect copy that same afternoon of February 22, 2002.  *Plaintiff's Exhibit 91*.

Mr. Rohane testified with respect to his review of the actual financial statement.  He said that although the financial statement was not "great," it was in good form and that it listed substantial equipment and income.  Mr. Rohane concluded that it revealed that the company was making money, that Morrison was paying himself a substantial salary and distributions and that he was satisfied with it.  However, because it was an income tax basis statement, he asked his partner, Wes Knapp, CPA ("Mr. Knapp"), to also look it over.  On cross-examination, Mr. Rohane believed his company had made a credit reference to Holt and that Morrison was current with Holt but Mr. Rohane did not personally make the call and he could not recall who had.  There was no other evidence with regard to direct contact with credit references other than this testimony.  Western Builders also pulled a Dunn & Bradstreet report, but did not place much reliance on the report because so few credit references were reported.  However, the report gave Western Builders  a "fair" rating.

Mr. Knapp, a CPA and Western's CFO, testified that he was asked by Mr. Rohane to look over the statement.  Mr. Knapp's wife had known Morrison's wife in college.  Because of this and because he did not make construction decisions for Western, Mr. Knapp wanted Mr. Rohane to actually decide whether to engage Morrison's company.  He had the same impression as did Mr. Rohane.  The statement was consistent with other single owner businesses.  He

8

thought that although the equity was low, that this was typical of single owner businesses.  He also noted that the financial statement was prepared on an income tax basis, which led Mr. Knapp to believe that the equipment shown on the statement probably had a higher market value than what was listed because income tax depreciation schedules permit accelerated depreciation in excess of that of the actual market value depreciation of equipment.  Mr. Knapp indicated that the financial statement itself was satisfactory in form for a business like Morrison's, met industry standards and was in better form than many documents submitted by other subcontractors to support their financial ability to perform.  Mr. Rohane's testimony regarding the condition of Morrison's equipment bolstered their reliance on such equipment having a higher value.

Morrison Excavation obtained the contract with Western Builders effective as of March 6, 2002.  The contract was evidently received for signature by Morrison on March 8 and returned to Western Builders on March 18.  Construction started some time in March, 2002.

Mr. Brookes testified regarding Western Builders' payments to Morrison Excavation which began on March 28, 2002.  Mr. Brookes explained that several advance payments were made at the request of Morrison Excavation, meaning that Western Builders was advancing its own money to Morrison Excavation before it received funds from the owner of the project.  With these advances, Morrison Excavation would certify that prior payments to lien claimants and suppliers had been paid.  Mr. Brookes provided competent testimony that this was not always the case as Western Builders started to receive lien notices in connection with payments that should have already been made by Morrison Excavation according to the payment certifications.  Further, Morrison Excavation's subs and suppliers started to leave the job.  The project slowed and eventually progress halted altogether.  Although Western Builders attempted to negotiate

9

with Morrison Excavation to hopefully save the contract, by mid-August after receiving additional lien notices and visiting the abandoned job site, Western Builders indicated it had no other choice than to terminate the contract, try to locate other suitable contractors and complete the job.

The job had cost overruns that required additional funds to be expended by Morrison Excavation, funds the company did not have which compounded its financial problems. Morrison claims that he was unable to use the soil samples from the job site as he had anticipated and had to import soil in connection with the project which led to the cost overruns. However, Mr. Brookes testified that subcontractors bore this risk and that Morrison was privy to the soil sampling tests provided by the owner of the property prior to submitting his bid. Even so, Western Builders approved two change orders which increased the original amount of the subcontract to Morrison Excavation's benefit.

Mr. Rohane testified that Western Builders spent $244,978.53 to resolve the liens that were filed on behalf of claimants of Morrison Excavation. *Plaintiff's Exhibit 191.* An itemization of work remaining was prepared. *Plaintiff's Exhibit 118.* Mr. Brookes visited the job site to verify the work remaining and several subcontractors and suppliers were hired to complete the project. Mr. Brookes testified as to the amount over the original subcontract that Western Builders paid to complete Morrison Excavation's work which was $549,773.63. This included the lien claims as well as the money paid to the new subcontractors and suppliers. *Plaintiff's Exhibit 190.*

Harvey Corn was called by Morrison to testify as to the reasonableness of the reliance on the incorrect financial statement. Although Mr. Corn had some criticisms of the financial statement, he admitted that he had never worked for a construction company, and as a result,

10

could not testify what a construction firm should reasonably rely on.   Mr. Corn, however, expressed concern about certain things he believed Western Builders should have done in addition to reviewing the statement itself.   Mr. Corn testified that he would have requested additional information regarding the fixed assets of the company as well as requested and reviewed an accounts receivable and accounts payable log.    Had Western requested this information, Mr. Corn indicates they would have discovered not only the accounts receivable error immediately as the $857,000 plus receivable was being carried in a "Miscellaneous" category, but also a negative entry in the accounts payable log which Western Builders and Mr. Fuller apparently never caught  in either of the financial statements  issued. *Transcript Pg. 391-396.*   However, Mr. Corn agrees that seeing the equipment on four job sites might mitigate the need for a depreciation/valuation schedule on the assets.  And, Mr. Corn admitted that, in his view, an honest businessman who learned of an error like the one in question would be expected to notify anyone who had received a financial statement with the error simply as a matter of ordinary business dealings.  He also testified that if any of his clients did not allow for revised financials, then his firm would withdraw representation.  The point is Morrison's own expert noted that as a businessman Morrison had a duty to report significant changes in his financial condition if he knew about them.  Morrison appears to argue that Mr. Fuller never told him to tell Western Builders.  However, Mr. Fuller told Morrison that Kyle Hughes should be informed of the error.  And, Mr. Fuller, in his testimony, indicated that he did not know if Morrison had sent the financials to anyone else.

<u>The Problem</u>

Four witnesses testified concerning Morrison's knowledge of the accounts receivable error as of February 22, 2002  prior to his faxing the incorrect financial statement to Western

Builders.   Morrison testified that he requested the financial statement from Fuller on February 22 and faxed it directly to Western Builders when he received it.   Indeed, the fax to Western Builders was sent seven minutes after receiving the faxed financial statement from Mr. Fuller. Morrison testified that he did not know about the accounting error until Mr. Fuller told him around March 23 or 24  in connection with the actual sale of stock to Kyle Hughes and that was the first he knew of it. *Transcript Pg. 32-33.*   Mr. Fuller also tied his discussion with Morrison about the error to the Hughes sales transaction, but he did not know specifically when he and Morrison discussed the error.   He testified that he talked with Ms. Dexter about the error, but did not immediately talk with Morrison because he wanted to give Ms. Dexter time to talk with Morrison first.   Mr. Fuller's specific testimony about when he told Morrison about the error was that he told "probably middle of March. . . .it was a while after this February 15." *Transcript Pg. 152.*   Mr. Fuller unequivocally testifies that by February 22, 2002, when the financial statement was sent to Western Builders, he personally had not talked with Morrison about the error. *Transcript Pg. 152-153.*  He had only discussed it with Ms. Dexter.

However, Mr. Fuller was asked at trial if he said in his deposition that Ms. Dexter had told him that Morrison wanted to see the error when she requested the financial statement on February 22, 2002.   Fuller responded, "Yes, I said that in the deposition and whether David wanted to see it or she's [Ms. Dexter] wanting to show it to David, but yes David wants and needs to see the error." *Transcript Pg. 125.*   But the next day in court, Mr. Fuller clarified his testimony, explaining that Ms. Dexter wanted the financial statement on February 22, 2002 "either to show to David or she had told David and he wanted to see it on the financial statement." *Transcript Pg.  125.*

12

Ms. Dexter does not specifically testify as to the exact date Morrison knew about the financial error. The closest Ms. Dexter comes to pinpointing a date she allegedly told Morrison about a financial error was to answer 'yes' when asked if it was "around February 15." *Transcript Pg. 197 and 201.* Ms. Dexter did indicate that she spoke with Morrison in his office with the door closed about the fact that they could not stay in business if more money continued to go out than come in but then again could not pinpoint a specific date or month for this conversation only that it was in 2002. And, when asked about her conversations with Morrison about the inaccurate financial statement having gone to Western Builders, she deferred, saying: "I don't recall a specific conversation: specific words that were said. I just remember thinking I was disappointed that that had gone out the door and that they needed to have a corrected one." *Transcript Pg. 202.* Ms. Dexter's overall testimony strongly suggests that Morrison most likely knew by February 22, 2002 that the financial statement contained an error–but perhaps did not know the magnitude of the error.

Ms. Davenport was also equivocal in her testimony. She did not testify as to any actual conversation she had with Morrison about financial matters of any kind. She indicated she prepared accounts payable aging reports each month that were on his desk; but then she claimed to know nothing of the additional accounts payable error that also occurred around the time of the significant accounts receivable error about which she knew quite a bit.

Ms. Davenport never testified that she talked with Morrison about the error in the financial statement before he signed the contract. She did indicate that she overheard Ms. Dexter tell Morrison about the error and that he was desperate to get the Western Builders' job; but she did not tie his alleged desperation to sending out the financial statement. Ms. Davenport claimed Ms. Dexter told Morrison about the error and that Ms. Dexter told Morrison "at or about the

13

same time that the error was discovered." *Transcript Pg. 177.* And, she also claimed to have

heard Ms. Dexter tell Morrison that the financial statement was inaccurate and that this occurred

"very close to the same time" that Ms. Dexter told Morrison about the actual error. *Transcript*

*Pg. 177.* She also testified that Ms. Dexter approached Morrison "several times" about the

financial statement being incorrect, and that Ms. Dexter inquired whether Morrison wanted to

send it to Western Builders. *Transcript Pg. 178.* She testified that all these conversations took

place before the contract with Western Builders was signed, but that is as close as she came to

pinpointing a date for all these conversations. Ms. Davenport testified that in her heart she

knew that Morrison knew about the error in the financial statement based on "being in the office

and overhearing conversations and knowing what was going on at the time." *Transcript Pg. 190-*

*191.*

Conclusions of Law

1. "Debt" under §523(a)(2)(B)

Section 523 of the Bankruptcy Code states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does
   not discharge an individual debtor from any <u>debt</u>

(2) for money, property, services or an extension, renewal, or
   refinancing of credit, to the extent obtained by–

(B) use of a statement in writing –

   (i) that is materially false:

   (ii) respecting the debtor's or an insider's financial condition;

   (iii) on which the creditor to whom the debtor is liable for such money, property,
        services or credit reasonably relied; and

   (iv) that the debtor caused to be made or published with intent to deceive;

14

11 U.S.C. §523(a)(2)(B)(West 2006)(Emphasis added).

Morrison argues in his Post-Trial brief that Western Builders has asked only that its claims (whatever they are) be determined to be nondischargeable.  Morrison claims that Western Builders has not sued Morrison with respect to a debt as required by §523(a)(2)(B).    That §523(a)(2)(B) does not in itself impose liability on the debtor for obtaining money for an insider is correct.  The statute  merely holds such a debt nondischargeable if the debtor is otherwise personally liable for the debt resulting from the issuance of the false financial statement by the debtor's corporation.

In its live pleading Western Builders asserts that "Morrison is the <u>principal stockholder</u> and <u>President</u> of Morrison Excavation and personally took all action and is responsible for all omissions of Morrison Excavation that are described in this pleading."  *Amended Complaint to Determine Dischargeability of Debt*, ¶ 3 (Emphasis added).  Western Builders pleads that "Morrison Excavation is the alter ego of Morrison" or, alternatively, that "Morrison caused Morrison Excavation to be used for the purpose of perpetrating a fraud and did perpetrate an actual fraud on Western Builders primarily for his own personal benefit."  *Amended Complaint*, ¶ 15.  Western Builders then specifically and clearly pleads the alleged facts which lead to the foregoing fraud allegations.  In its Pre-Trial Order under "Agreed Applicable Law" Western Builders specifies Texas Business Corporations Act Article 2.21(A)(2) and under "Summary of Disputed Legal Issues" specifies "Morrison is liable for the damages [of Western] under the Texas Business Corporations Act §2.21(A)(2) and under common law citing  *Miller v. Keyser*, 90 S.W.3d 712, 718 (Tex. 2002)

In his Post-Trial Brief, Morrison attempts to argue that Western Builders does not specify any state law causes of action for holding Morrison personally liable for the corporate debts of Morrison Excavation.    So, Morrison, not at trial, but in his Post-Trial Brief claims that there is no liability claim pled against him and without such claim to support recovery, there is no basis for this Court to award Western Builders' damages.    This is not the case.

Western Builders clearly alleged fraud in its Amended Complaint  individually against Morrison as a stockholder and President of Morrison Excavation.  Western Builders' Pre-Trial Order contains reference to Morrison's liability under the Texas Business Corporation Act Article 2.21(A)(2) which imposes shareholder liability for actual fraud or constructive fraud for a corporate obligation if the obligee demonstrates that the shareholder . . . "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit" of the shareholder.  TEX. BUS. CORP. ACT, art. 2.21(A)(2)(West 2006).    In addition Western cites to state common law holding corporate agents liable for misrepresentations made on behalf of the corporation.  *Miller v. Keyser, supra.* There was no objection or exception to the pleadings requesting elaboration of these causes of action or any objection to the inclusion of these causes of action in the Pre-Trial Orders at trial. The parties obviously tried the case on these grounds by consent.  As such Western Builders has two bases to support the liability of Morrison in his individual capacity under state law–Article 2.21(A) and common law tort.

Section 2.21 of the Texas Business Corporation Act  provides:

A holder of shares. . . shall be under no obligation to the corporation or to its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder. . . is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud or other similar theory, unless the obligee demonstrates that the holder. . .caused the corporation to

16

be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder.

TEX. BUS. CORP. ACT,  art. 2.21(A)(2)(West 2006).

Article 2.21 allows a person to go behind the corporate entity in order to establish individual shareholder liability by a showing of actual or common law fraud. "Where actual fraud primarily for the benefit of the perpetrating shareholder or shareholders can be shown, the various doctrines for disregarding the corporate entity, including alter ego and a sham to perpetrate a fraud, are still very much alive." *Farr v. Sun World Savings Association,* 810 S.W.2d 294, 296 (Tex. App.–El Paso 1991, no writ).

Western Builders' premise is that Morrison, on behalf of Morrison Excavation, provided an inaccurate financial statement to Western Builders so that Morrison Excavation could obtain a subcontract to perform site work on the Eagle Pass project. Western also sought to prove that Morrison took more money out of the corporation than he should have taken, and that Morrison Excavation did not have sufficient financial controls in place and that his actions against Western Builders were primarily for his personal benefit.

Morrison argues that the evidence does not come close to showing that he acted primarily for his own direct personal benefit when he had Morrison Excavation send a financial statement to Western on February 22, 2002, and therefore he cannot be responsible as a shareholder for whatever injury Morrison Excavation inflicted on Western. Morrison urges that all the evidence shows is that Morrison was trying to obtain a lucrative contract for his company.

However, Morrison was the majority stockholder and President of Morrison Excavation. He alone ran the company and made all the decisions regarding its operation. Any benefit to Morrison Excavation was a personal benefit to Morrison. After all, Morrison knew of the dire

17

financial condition of his company when Mr. Fuller so advised him in early February.  He knew he needed this contract to keep the doors open.   And, he needed the doors to stay open in order to draw his large salary and maintain his lifestyle.  If Morrison committed a fraud on Western Builders by making a misrepresentation regarding Morrison Excavation's financial statement, then he is personally liable for his actions.

Further, Texas law appears to allow individual liability on the part of a corporate agent for misrepresentations made by him. *Miller,* supra at 717.  *See also, Weitzel v. Barnes,* 691 S.W.2d 598, 601 (Tex. 1985)("Implicit in our holding in [*Light v. Wilson*, 663 S.W.2d (Tex. 1983)] is that there can be individual liability on the part of a corporate agent for misrepresentations made by him.")   Morrison was President of Morrison Excavation and therefore an agent of the corporation.  Thus, if Morrison made the misrepresentation to Western Builders as alleged, he can be personally liable for such action.

Morrison also claims that by using the inaccurate financial statement, Morrison Excavation did not secure "money, property, services or an extension, renewal or refinancing of credit" from Western Builders, only a subcontract to perform construction services.  11 U.S.C. §523(a)(2)(B)(West 2006)..

Section 523(a)(2) expressly includes "services" as well as money and property.  Thus, professional services, such as those of an attorney or physician or hospital, as well as any type of work and labor, obtained by means of fraudulent representations, are within the scope of this section.   "Use of the word "services," without any modifying adjective, makes it clear that services of any kind whatsoever are included." *Collier on Bankruptcy* ¶523.08[1][b] and [c] (2006).  Although this discussion in *Collier's* relates to §523(a)(2)(A), the phrase is contained at the beginning of §523(a)(2) and is applicable for both §§523(a)(2)(A) and (B).  This is a

subcontract to perform construction <u>services</u> as defined by Morrison himself in his Post-Trial brief.

### 2.  Other §523(a)(2)(B) Issues

Each of the elements of §523(a)(2)(B) must be proven by a preponderance of the evidence.  *Grogran v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed. 2d 755 (1991).  Thus, a creditor must prove that the debt was obtained by the use of a statement

(1) in writing;

(2) that is materially false;

(3) respecting the debtor's or an insider's financial condition;

(4) on which the creditor to whom the debtor is liable for money, property, services or

   credit reasonably relied;

(5) that the debtor caused to be made or published with intent to deceive.

At trial, the Court determined that the parties were obviously proceeding on the assumption that the financial statement was a materially false writing respecting an insider's financial condition.  The Court  requested briefing with respect to the other two elements i.e. whether Western Builders  reasonably relied on such financial statement and whether Morrison actually made the misrepresentation with the intent to deceive.   The Court also allowed additional briefing under §523(a)(4) and §523(a)(6) although the Court indicated the burden would be difficult to overcome with respect to these two sections.

### A.  Reasonable Reliance

"Reasonable reliance" is a higher standard than "justifiable reliance." *Field v. Mans,* 516 U.S. 59,76 (1995).  The starting point for a "reasonable reliance" analysis begins with *In re Coston*, 991 F.2d 257 (5th Cir. 1993).  Here, the Fifth Circuit held that "[t]he reasonableness of a

creditor's reliance . . . should be judged in light of the totality of the circumstances. The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Id.* at 261(citations omitted).

The Fifth Circuit in *In re Norris,* did not set out the standard for "reasonable reliance" but noted that the bank's reliance was "objectively reasonable" and found no problem with the bankruptcy court's conclusion that the financial statement in issue was not such a "red flag" as to invoke a duty to investigate. 70 F.3d 27, 30 (5th Cir. 1995). In *In re Young*, the Fifth Circuit stated that, whether a creditor's reliance is reasonable is determined from a totality of the circumstances, and it noted that the bankruptcy court had received evidence about the relevant practice in the industry. 995 F.2d 517 at 549 (5th Cir.1993). It found that the financial statement in issue did not raise such a "red flag" as to invoke a duty to investigate. *Id.*

(i). Previous Business Dealings

Since there were no previous business dealings between Western Builders and Morrison Excavation, Morrison argues that Western Builders had no reason to trust Morrison Excavation and should have exercised more care in dealing with the corporation. However, this is exactly what Western Builders did. Its President, Mr. Rohane, and Mr. Brookes visited several of Morrison Excavation's job sites (both complete and in progress) in Austin and personally visited with Morrison. Mr. Rohane was impressed with the performance and condition of the work he saw at the job sites, (talked with the superintendent of Morrison Excavation on a job as well as a superintendent of the general contractor of a job) and the condition of the equipment. Mr.

20

Rohane also pulled a credit report on Morrison Excavation and indicated Morrison's payments were timely to one of Morrison Excavation's suppliers even though he could not recall who had contacted them.  And, Western Builders requested a financial statement which was reviewed by both Western's President and its CFO.  Western appears to have exercised due diligence in dealing with a potential new subcontractor and evidently wanted the financial statement to enable it to "seal the deal" if such statement was satisfactory.

(ii)  Red Flags

Morrison claims that the financial statement and other information Western Builders had available should have raised a number of red flags to an ordinarily prudent recipient of the information and required Western Builders to investigate further.  Morrison claims the first page alone of the financial statement put Western on notice that the statement was not audited nor prepared according to GAAP.  They urge that other red flags also existed citing to Mr. Rohane's testimony that he noticed substantial receivables and Mr. Knapp's reporting that the statement was not the strongest he had ever seen and that the equity position was very thin with low working capital.  Mr. Knapp also agreed that the cash-flow statement was ambiguous.  However, Mr. Rohane stated  that when he met with Morrison on February 22, 2002, Morrison mentioned potential investors to infuse the company with capital and to deal with the financial side of the business, a positive indication of the company's future.  Mr. Rohane also indicated he knew Morrison Excavation's credit report showed only a "fair" history; but that was just part of the due diligence he undertook.

Harvey Corn testified that a reasonably prudent person, after review of the financial statement, would investigate further.  He indicated Morrison Excavation was overdrawn by $48,000 and that its assets exceeded its liabilities by only $7,300.  He noted that accounts

receivable were a major asset and that he "wouldn't go a step further" without seeing an accounts receivable report. *Transcript Pg. 389-390.* He agreed with Mr. Knapp that it was "virtually impossible" to tell anything from the cash-flow statement except that there had been a net decrease in cash of $203,000. *Transcript Pg. 391.* Mr. Corn found several red flags for his purposes as an expert.

### (iii). Minimal Investigation

Mr. Corn believed that further investigation was necessary and that even a minimal investigation would have revealed the $857,000 plus error in the financial statement. All Western Builders had to do was request an accounts receivable and payables aging summary. Accounts receivable would have shown $1.8 million in receivables with over $1 million 90 days past due with the single largest receivable ($857,000 plus-Miscellaneous) raising a big question for anyone reviewing such. The accounts payable aging summary would have shown whether Morrison Excavation was paying its creditors timely–which it was not. It was Mr. Corn's opinion that a company employee who relied on the Morrison Excavation financial statement would have exhibited "poor employee behavior" and a CPA who relied on it would have committed malpractice. *Transcript Pg. 399-400.* In sum Morrison argues that Mr. Corn's testimony shows that minimal investigation–a single telephone call to Mr. Fuller or Morrison to request the specified reports would have revealed the error in the financial statement.

A creditor is not required to assume that a debtor is lying or misrepresenting facts in a financial statement. *Heritage Bank of St. Joseph v Bohr (In re Bohr),* 271 B.R. 162, 168 (Bankr. W.D. Mo. 2001) "While a minimal investigation would most likely have revealed the true ownership of the real estate and thereby exposed the falsity of the financial statements, there were no 'red flags' for the Bank that would have triggered such an investigation" until the debtor

informed the Bank more than a year after the last financial statement that they did not actually own the property outright. *Id*. at 168-169.  At that point, the Bank immediately investigated the debtors' assets and learned the truth.

The fact of the matter is that there was no evidence that Western Builders had any reason to know or suspect that the financial statement which Morrison Excavation submitted was false or inaccurate.  Western should not be faulted for accepting the figures on a financial statement prepared by Morrison Excavation's CPA.   Western Builders recognized that Morrison Excavation's financial statement was not the best in the industry, but it was reasonably satisfied especially since (1) Mr. Knapp and Mr. Rohane believed the equipment values were likely understated since the statements were prepared on an income tax basis; (2) Mr. Rohane and Mr. Brookes had visited several sites and had met Morrison personally; (3) the equipment on the job sites was in excellent condition supporting Mr. Knapp's belief that the equipment was understated due to accelerated depreciation; (4) they had spoken to a superintendent on one of the sites who was pleased with Morrison Excavation's work; and (5) they had checked a credit history (although it was somewhat sparse) and verified Morrison Excavation's recent payments to at least one major creditor, Holt.  Based on the totality of the circumstances in this case, the Court finds Western's reliance reasonable.

B. Intent to Deceive

As is often the case in this type of situation, the creditor's most difficult task is proving the debtor published the relied upon data with the intent to deceive.  An intent to deceive does not mean that the debtors acted with a "malignant heart."  *Bohr,* 271 B.R. at 169 quoting *Agribank v. Webb (In re Webb),* 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000).  A creditor may establish such intent by proving reckless indifference to or reckless disregard of the accuracy of

the information in a debtor's financial statement. *Fairfax State Sav. Bank v. McCleary, (In re McCleary),* 284 B.R. 876, 888 (Bankr. N.D. Iowa 2002). Factors to consider include if the debtor was intelligent and experienced in financial matters, and if there was a clear pattern of purposeful conduct. *Id.* "Once the creditor establishes that the debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent." *Bohr,* 271 B.R. at 169.

The statement at issue was prepared by Mr. Fuller, Morrison Excavation's CPA. However, Morrison, himself directed the financial statement be sent to Western Builders. The question is whether Morrison on February 22, 2002 knew that the accounts receivable error existed. Second, if he did not know that the mistake existed on February 22, whether he had a duty to inform Western Builders when he actually discovered the mistake.

Intent is inferred from the facts. In this setting Western Builders must prove that Morrison knew the financial statement contained false information or that he sent it with reckless disregard for the truth. Western Builders claims that Ms. Dexter and Ms. Davenport's testimony along with Mr. Fuller's contradicts Morrison's testimony that he learned of the error on March 23 or 24 of 2002 and shows that he knew the financial statement was inaccurate on February 22, the day he faxed it to Western Builders. They further argue that the undisputed evidence shows that Morrison knew of the error in the financial statement by March 23 or 24; and, at that time, no funds had been paid to Morrison Excavation by Western Builders under the contract.

Mr. Fuller's testimony was that he had not talked with Morrison as of February 22 about the accounting error although he thought that Ms. Dexter had requested the financial statement on February 22 to show the error to Morrison. But, his testimony is inconclusive as to whether this actually occurred or whether Ms. Dexter simply requested the financial statement for

24

Morrison to send it on seven minutes later to Western Builders.  If Ms. Dexter knew of the error by February 15, it is likely that she would have told Morrison of the error before the financial statement was sent to Western Builders.  And, the testimony of both Ms. Dexter and Ms. Davenport strongly suggest that Morrison must have known about the error on February 22, although neither actually pinpoints the date specifically.  They can only state that they believe he knew around this date, and that he must have known before the contract between Western Builders and Morrison Excavation was executed.

Morrison argues that Ms. Davenport's testimony that she heard Ms. Dexter discuss the financial error several times with Morrison is hearsay. Western Builders claims that these statements are admissions under Fed. R. Evid. 801(d)(2)(C) as a statement by a person authorized to speak and/or 801(d)(2)(D) a statement by agent or servant concerning matters within the scope of his agency or employment.   Morrison claims these rules cannot apply because Ms. Dexter's statements regarding the accounts receivable error are inadmissible against Morrison personally: Morrison claims they are only admissible possibly against Morrison Excavation.  And, he claims that Morrison did not actually authorize Ms. Dexter to make the statements regarding the financial information.

For purposes of 801(d)(2)(D) "authority to speak is no longer of concern; what is required is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." *United States v. Paxson*, 861 F2d 730, 734 (D.C. Cir. 1988)   Further, when the factors proving an agency relationship are present, the testimony should not be excluded simply because it is offered against a corporate employee rather than the company itself. *Id.*

As per the Tenth Circuit:

> the admission of a statement by a corporate employee against his corporate superior rather than against the corporation itself "may create a loophole in the hearsay rule through which evidence not contemplated by the authors of Rule 801 could be admitted." *United States v. Young,* 736 F.2d 565, 567 (10th Cir. 1983)(*per curiam*), *rev'd on other grounds,* 470 U.S.1, 105 S.Ct. 1038, 84 L.Ed. 2d 1 (1985).  However, as the *Young* court further noted, "if the factors which normally make up an agency relationship are present, the evidence should not be excluded simply because the statement is offered against a corporate officer rather than the corporation.." *Id.* at 568.

*Paxson*, 861 F.2d at 734.

The factors normally making up an agency relationship are present here and the evidence was properly admitted.  Morrison directed Ms. Dexter as a financial clerk and the discussions regarding the financial errors are well within the purview of Ms. Dexter's employment.

Consequently, the totality of the facts taken together indicate that Morrison knew of the error on February 22.  Morrison knew by February 6 (if not before) the poor financial condition of his company, that bills were not being paid timely, that bills were still owed on completed projects, that more money was going out than coming in, and that he needed an infusion of capital from an investor; something he was then actively pursuing.   But, even if Morrison did not clearly understand the magnitude of this error on February 22, he certainly did know by late March before he ever received any funds from Western Builders.

One court has indicated that knowledge by a debtor of the falsity of the financial statement could impose upon him a duty to correct the information.  *Mann v. First National Bank of Boston,* 40 B.R. 496, 500 (Bankr. Mass. 1984).  The *Mann* Court found though under its facts that "even assuming the existence of errors in the materials forwarded to the Bank, the

26

Bank failed to show that Mann had any knowledge which would impose upon him a duty to correct the information." *Id.*

In the case of *First National Bank of Elgin v. Nilles*, the debtor had given the bank a financial statement which had a provision that represented the truth of the financial statement and that it could be considered as continuing to be true and correct, unless a written change notice was given to the bank. Judge Grady, in finding the debt in this case nondischargeable wrote:

> "We believe that aside from the <u>literal</u> requirements of the financial statement, Nilles had a duty of fair dealing which arose when he undertook to consummate a business transaction with the Bank. *See Matter of Garman*, 643 F.2d 1252, 1260 (7th Cir. 1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981)("The law recognizes the duty of each to refrain from even attempted deceit of another with whom he deals, and the right of the latter to assume that he will do so," *quoting from Jacobsen v. Whitely,* 138 Wis. 434, 120 N.W. 285, 286(1909)).

35 B.R. at 411 (Emphasis added). And, in *Lincoln First Bank v. Vairo,* the court wrote:

> Moreover, when the debtor included a contemplated interest in real estate as valued at $10,000, despite the fact that the interest never materialized and he was aware of this fact, he violated his "duty of fair dealing which arose when he undertook to consummate a business transaction with the Bank." *First National Bank of Elgin v. Nilles,* 35 B.R. 409, 411 (N.D. Ill. 1983)(citation omitted). Having made an incorrect statement with respect to the real estate interest which the debtor knew did not exist, and with respect to which "he has reason to believe another is relying upon is under a duty to correct it." *Id.* (citation omitted).

40 B.R. 776 (S.D. New York 1984).

Here, the evidence is clear. Morrison himself testified that he knew of the error in the financial statement no later than March 23 or 24 which was before any money had been paid to Morrison Excavation under the contract. Where a debtor knew or should have known of errors in a financial statement and he fails to correct the error, it may be inferred that he has intended to

deceive the creditor. *In re Bradford,* 22 B.R. 899, 902 (Bank. D. Olka. 1982); *Matter of Gray,* 22 B.R. 676, 680 (Bankr. D.Wisc. 1982).

Morrison acted with reckless disregard for the truth, if not actual intent to defraud. Based upon his conversation with Mr. Fuller in early February and the fact that he was the man in charge of virtually everything Morrison Excavation did, he clearly was intimately aware of the company's deteriorating, if not dire, financial condition when he met with Western Builders and sent the financial statement. If he only knew then that the financial statement was potentially erroneous, he had a duty to disclose such and not to just hide it by remaining silent. Then, when he discovered the immensity of the error before money had exchanged hands, he had the further duty to disclose it at that time. This he did not do. And, not only did he not disclose the error, but he asked for and got an advance of $65,000 on March 28, 2006 a point in time after he admits he knew of the error. Morrison's culpability is clear. He willingly violated his duty of fair dealing by keeping from Western Builders information he knew would spoil the deal if disclosed. Mr. Rohane testified that if he knew earlier that Morrison Excavation's subcontractors and suppliers were not getting paid, Western Builders would have issued joint checks to insure that the money paid to Morrison Excavation on the Eagle Pass project was paid only to entities that were working on that project and not used for other purposes. Western Builders has proved the requisite intent to deceive.

3. §523(a)(4)

Section 523(a)(4) of the Bankruptcy Code declares as non-dischargeable a debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." 11 U.S.C. §523(a)(4)(West 2006). It is "intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property

28

by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *In re Miller,* 156 F.3d 598, 602 (5th Cir. 1998)(quoting *In re Boyle,* 819 F.2d 583, 588 (5th Cir. 1987)). "Under §523(a)(4), 'fiduciary' is limited to instances involving express or technical trusts." *Id.* (quoting *Texas Lottery Comm'n v. Tran,* 151 F.3d 339, 342 (5th Cir. 1998)).

At the conclusion of the trial, this Court noted that it was unable to find any pre-existing trust between the parties to support a judgment in favor of Western Builders on this cause of action, but requested briefing on this issue. Western Builders did not brief this issue. And, the Court finds that there was no fiduciary relationship (no express or technical trust) between Morrison and Western Builders, and there is no allegation that Morrison obtained any of Western Builders' property through criminal conduct.

### 4. §523(a)(6)

The Court requested briefing on what "the record reflects were the specific actions that Morrison took that would be violative of §523(a)(6) as the Fifth Circuit has interpreted it. The Court could not determine what acts were contended that were "substantially certain to cause harm" nor the "specific injury that resulted therefrom." *Opinion of the Ct.,* pg.5.

Section 523(a)(6) requires a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6)(West 2006). In *Kawaauhau v. Geiger*, the Supreme Court framed the issue under §523(a)(6) as whether the willful and malicious exception covers acts done intentionally that cause injury or only acts done with the actual intent to cause injury. 523 U.S. 57, 62 (1998). The Court concludes that "the word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.*

29

at 61.  Section 523(a)(6)'s standard is an intentional tort standard, requiring that the actor intend the consequences of the act, not simply intend the act itself.  *Id.* at 61-62.  Debts arising from recklessness or negligently inflicted injuries do not fall within the compass of §523(a)(6). *Id.*

The Fifth Circuit has written on the meaning of §523(a)(6) on several occasions.  In *In re Miller*, the Court concluded that willful and malicious injury "is a unitary concept entailing a single two-pronged test." 156 F.3d 598, 603 (5th Cir. 1998).  *Miller* holds that for a debt to be nondischargeable under §523(a)(6), there must have been objective substantial certainty that the debtor's action would cause harm to the other person, or the debtor had a subjective motive to cause harm to the other person.  *Id.*  at 604; *See also Texas v. Walker,* 142 F.3d 813, 823 (5th Cir. 1998).  The *Miller* test remains in place today.  *In re Williams,* 337 F.3d 504, 508-09 (5th Cir. 2003).

Western Builders claims that the following actions by Morrison reflect §523(a)(6) violations:

"1.  Morrison entered into the contract with Western Builders knowing that his company was in severe financial difficulty. About two weeks earlier on Feb. 22 Morrison met with Western Builders' President Jerry Rohane and told him that Morrison Excavation's business was doing well and failed to mention the discovery of the huge error in the accounts receivable.

2.  Morrison pocketed $500,000 from the sale of 49% of his stock in Morrison Excavation to Hughes in March, 2002, thereby further reducing Morrison Excavation's ability to pay its debts.

3.  Morrison induced Ben Brookes to pay $111,375.00 to Morrison Excavation under false pretenses (Ex. P-15).  Morrison told Brookes the funds were to go for payment to a supplier, South Texas Aggregates, but instead Morrison diverted the funds for other purposes which he could not explain."

*Western Builder's Post Trial Brief,* pg. 15-16.

Western Builders contends that these transactions constitute conduct within the purview of

*Kawaauhau v. Geiger* and Fifth Circuit case law claiming that there was substantial certainty

that injury would result to Western Builders from Morrison's actions.  Under *Kawahaauhau* and *Miller*, Western Builders must show an objective substantial certainty that Morrison Excavation's providing of an inaccurate financial statement would harm Western Builders or that either Morrison or Morrison Excavation provided the financial statement with a subjective motive to harm Western Builders.  The Court is hard pressed to find his actions prove such.

Even though Morrison Excavation was in financial difficulty, its entrance into a potentially lucrative, mutually beneficial contract hardly suggests an intent to injure Western Builders.  If the project had gone as planned, both Western Builders and Morrison Excavation would have benefitted which cannot be viewed objectively as an action substantially certain to cause injury.

Morrison clearly knew that Morrison Excavation owed unpaid claims on finished jobs, had uncollected receivables and was suffering negative cash flow.  However, this evidence is not enough to establish that Morrison acted willfully and maliciously.  Injuring Western Builders would have provided no benefit to Morrison Excavation or Morrison himself.  Morrison appears to have been overly optimistic as to this transaction, but nothing that suggests his intent was to injure Western Builders.   While Morrison acted with reckless disregard for the consequences of his actions, the Court finds that he did not intend to injure Western Builders when he failed to provide the corrected information on the financial statement.

5. Damages

Mr. Brookes testified as to the damages sustained by Western Builders in connection with the project.  *Plaintiff's Exhibit 190, Transcript Pg. 337-340.*  Western Builders took the total amount it paid to complete the subcontract work (which included payments to Morrison Excavation under the original contract, Morrison Excavation's lien claimants as well as to other subcontractors/suppliers Western hired to actually complete the project) such amount totaling

31

$2,177,740.88.  From this amount Western subtracted Morrison Excavation's total subcontract amount of $1,627,967.25 (which was the original amount of $1,579,664.00 plus two increases for change orders of $37,338.25 and $10,965).  This left the amount paid by Western Builders in excess of the total subcontract amount with Morrison Excavation of $549,773.63.

This testimony was undisputed.  Western Builders is entitled to a judgment of $549,773.63 which is not dischargeable under 11 U.S.C. §523(a)(2)(B).

###